NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190723-U

NO. 4-19-0723

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 3, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| DEANDRE DESHAWN DANIELS, | ) | No. 12CF1193 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John C. Costigan, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices Harris and Holder White concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court reversed the trial court's second-stage dismissal of defendant's postconviction petition because (1) defendant's claim of actual innocence was arguably meritorious and (2) defendant made a substantial showing that he received ineffective assistance of trial counsel.

¶ 2       In November 2012, the State charged defendant, Deandre Daniels, with attempt (murder) (720 ILCS 5/8-4, 9-1 (West 2010)), aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)), and unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)). The charges alleged that on November 5, 2012, defendant used a firearm to shoot Robert Jackson in the leg.

¶ 3       In November 2013, the jury found defendant guilty of all four counts, and the trial court later sentenced him to 47 years in prison. Defendant appealed, and this court affirmed. *People v. Daniels*, 2016 IL App (4th) 140131, ¶ 105, 58 N.E.3d 902.

¶ 4        In August 2017, defendant *pro se* filed a petition for postconviction relief pursuant to the Post-Conviction Hearing Act (Act). 725 ILCS 5/122-1 (West 2016). In October 2017, the trial court advanced the petition to the second stage and appointed the public defender as counsel for defendant.

¶ 5        In June 2018, defendant filed an amended postconviction petition in which defendant argued that (1) counsel provided ineffective assistance by (a) failing to investigate and present an alibi defense and (b) failing to impeach the testimony of Raymond Davis and (2) defendant is actually innocent as shown by new affidavits from Jamell Jamison and Raymond Davis.

¶ 6        In July 2018, the State filed a motion to dismiss defendant's petition, and later that month, the trial court granted that motion.

¶ 7        This appeal followed.

¶ 8        On appeal, defendant argues that because (1) his claim of actual innocence was arguably meritorious as shown by a new affidavit from an eyewitness and a recantation from a witness who testified at trial and (2) his petition made a substantial showing of a constitutional violation due to ineffective assistance of counsel because trial counsel (a) failed to investigate and present an alibi defense and (b) failed to impeach the testimony of the same witness who is now recanting, this court should remand and advance the matter to a third-stage hearing. Based upon the Illinois Supreme Court's recent decision in *People v. Robinson*, 2020 IL 123849, we conclude that defendant has made a sufficient showing that he is entitled to a third-stage evidentiary hearing.

¶ 9                          I. BACKGROUND

¶ 10        Because this case comes to us on dismissal of defendant's postconviction petition at the second stage, we discuss only the facts relevant to that decision and those necessary to

provide sufficient context. A more thorough discussion of the facts can be found in the opinion that resulted from defendant's direct appeal. *Daniels*, 2016 IL App (4th) 140131, ¶¶ 4-60.

¶ 11 In November 2012, the State charged defendant with attempt (murder) (720 ILCS 5/8-4, 9-1 (West 2010)), aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)), and unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)). The charges alleged that on November 5, 2012, defendant used a firearm to shoot Jackson in the leg.

¶ 12 In November 2013, the trial court conducted defendant's jury trial.

¶ 13 A. The State's Evidence

¶ 14 Detective Jared Roth with the Bloomington Police Department testified that a rivalry existed between the M.O.B. and B.O.M. rap groups. He stated further that M.O.B. stood for "Money Over Bitches," and B.O.M. stood for "Blackout Mafia." He investigated the shooting but received "extremely little cooperation" from the eyewitnesses.

¶ 15 Bloomington police officer Eric Riegelein testified that at approximately 4:16 p.m. on November 5, 2012, he responded to a call of a shooting on Orchard Road. He arrived on the scene and observed Marcus Winlow lying on the ground. Michelle Brown was holding a bloody cloth against a wound on Winlow's body. Robert Jackson was nearby and had been shot in the left thigh. Nobody at the scene informed Riegelein what had happened.

¶ 16 Michelle Brown testified that on November 5, 2012, she lived in an apartment at 1213 Orchard Road. Her son, Marcus Winlow, lived at 1215 Orchard Road. Brown explained that she was familiar with people nicknamed "Play," "Jake," "Thoon," "Mooch," and "Pimp." She noted that "Pimp" referred to defendant and identified him in the courtroom. Winlow used to make rap music and went by the nickname "Li'l Dude." Brown also knew Kaythiese Fitch who went by

- 3 -

"KK" and was a friend of Winlow.

¶ 17        Brown said that on the afternoon of November 5, 2012, she was at her residence preparing to take the bus to the west side of town. One of her minor children came into the house screaming that Winlow had been shot. She ran outside and found Winlow lying on the ground outside her home with a gunshot wound in his back. Brown testified that she did not know who had shot her son.

¶ 18        Brown testified further that her son, Winlow, had been in a fight earlier on the day of the shooting. She recalled telling a police officer that Winlow and Kaythiese Fitch met with Robert Jackson and as they spoke, they were approached by another group. She told the officer that in that group, she recognized defendant, Kenneth King, Jake Williams, Qunshawn Gardner, Raymond Davis, and Anton Smith. The State asked Brown numerous additional questions about what she told officers immediately following the shooting in her recorded interview and what she testified to before the grand jury, and to nearly every question she responded that she did not recall making that particular statement and if she had made such a statement, it would have been a lie or false.

¶ 19        The State introduced an affidavit written by Brown prior to trial which stated that she wished to "remove [her] statement as the witness in this case." In the affidavit, Brown said that she did not see "Jake Williams, [defendant], Qunshawn Gardner, Anton Smith, Kenneth King, or Raymond Davis at the crime scene." She wanted all the charges to be dropped and stated that she would not testify at trial. She ended the affidavit by saying that she was not coerced into writing the affidavit; however, she also concluded by writing, "I would like all the gentlemen upon release to be ordered to attend several churches and give their testimonies while they thank God for a second chance in life."

¶ 20    The State later introduced the recorded interview of Brown conducted at the police station on the evening of November 5, 2012. During the interview, Brown stated that on November 5, 2012, she was walking on Orchard Road behind Winlow and Fitch, who both stopped to talk to Jackson. As the three were talking, a group of other men approached them. The other group included defendant, Williams, "S Dot," "Kenny," "Play," and approximately four other people. Fitch and "Play" began fighting. Williams pulled out a gun and shot Winlow one time. Williams then ran off. Fitch and Jackson ran toward a nearby gangway. Defendant pulled out a gun and fired approximately four times toward the gangway. Brown stated that defendant shot Jackson in the leg. Later in the interview, Brown stated that she did not actually see Jackson get shot. "S Dot" also had a gun and pointed it at Brown when she accidentally picked up "S Dot's" jacket. Brown stated further that Raymond Davis, who was also present, was carrying a gun and wearing dreadlocks.

¶ 21    Jackson testified that he was shot in the left thigh on November 5, 2012. As of the time of trial, the bullet remained in his thigh. Jackson said that he was friends with Winlow and Fitch but was not familiar with B.O.M. or M.O.B. Neither he nor Winlow made rap music but Fitch did. Jackson said he was walking by himself in a vacant lot on Orchard Road when he was shot. He did not see who shot him. He went to the hospital, where doctors told him that the bullet could stay in his leg because it was not life-threatening.

¶ 22    Bloomington police officer Michael Luedtke testified that on November 5, 2012, he responded to a call on Orchard Road. He observed Winlow lying in the road next to a parked car and Jackson sitting on the hood of that car. Winlow had a wound to his abdomen. Jackson had a bullet wound on his left thigh. Jackson told Luedtke that "he was just standing there" and did not know who had shot him.

¶ 23    Luedtke testified further that he interviewed Brown, who approached him and told him she saw a group of people shoot at Winlow and Jackson. She said she was walking out of her residence when she saw "a group of black males run up on Marcus and Robert." Brown said she saw defendant, Williams, "Kenny," "S Dot," and "Play" "run up on" Winlow and Jackson. Brown told Luedtke that she saw defendant shoot at Jackson five times with a black gun.

¶ 24    Raymond Davis testified that on the afternoon of November 5, 2012, he was at King's apartment on the 1200 block of Orchard Road. Defendant was also there. Davis, King, and defendant made hip-hop music together in a group called "M.O.B., Members of Business," and they were making hip-hop music together that day at King's apartment.

¶ 25    While Davis was at King's apartment, Marcus Winlow and Kaythiese Fitch were there and Davis got into a fistfight with Winlow. After the fight ended, Davis, King, and defendant went to defendant's apartment and listened to music. "S Dot" and "Play" joined them there. Davis testified further that after staying at defendant's apartment for approximately 10 or 15 minutes, the group decided to record music at a studio.

¶ 26    Davis, defendant, King, and "S Dot" got in a van and drove back to King's apartment to retrieve King's phone. As they walked from the van to King's apartment, a group of people ran up and attacked them. Davis described that he was in the street near a big grassy field. One of the attackers hit Davis in the face, but as he prepared to defend himself, he then heard gunshots and ran back to the van, along with King and "S Dot." Defendant did not return to the van.

¶ 27    Davis testified further that on November 5, 2012, he had cheek-length dreadlocks. Davis had heard of a group called B.O.M. but did not know whether Winlow and Fitch were part of that group.

¶ 28                                    B. Defendant's Evidence

¶ 29          Brandi Guzouskis testified that on November 5, 2012, she lived at 1214 Orchard Road. Guzouskis was home that day when, at approximately 4:15 p.m., she heard "about five" gunshots. The balcony to Guzouskis's apartment overlooked the vacant lot on Orchard Road. After she heard gunshots, Guzouskis looked out her balcony door and saw several men walking east. She called 911 and told them that a black male with a white tank top, dark jeans, and dreadlocks had a gun. She then saw the man shoot the gun two times while aiming toward the north. She saw two men on the ground. Defendant then introduced the audio recording of Guzouskis's 911 call.

¶ 30          Anthony Gibson testified that on November 5, 2012, he was working at Lube Pros just off Orchard Street. At approximately 4:16 p.m., he heard between six and eight gunshots. Gibson thought he had heard kids playing with fireworks. The shots came in two waves: "a few gunshots, then there was a pause, and there was a pause and then there was a few more." Gibson did not see who fired the gunshots but saw people running.

¶ 31          Brittany Van Buren testified that she was defendant's girlfriend. She stated that on November 5, 2012, defendant had short hair and did not have dreadlocks. She said that defendant did not own a gun.

¶ 32          The jury found defendant guilty on all four counts. As to the charge of attempt (murder), the jury also found that defendant personally discharged a firearm that proximately caused great bodily harm or permanent disfigurement to another.

¶ 33          In January 2014, the trial court conducted defendant's sentencing hearing at which it sentenced him to 47 years in prison.

¶ 34                                    C. The Appeal

¶ 35          Defendant appealed, arguing that (1) the trial court abused its discretion by denying

defendant's motion that the court question potential jurors about their gang bias, (2) the court abused its discretion by admitting specific acts of violence that occurred between the two groups, (3) the court abused its discretion by admitting evidence that defendant was visited in jail by his codefendants, (4) counsel was ineffective for failing to move to sever the charge of unlawful possession of a weapon by a felon, and (5) the evidence was insufficient to prove that defendant personally discharged a firearm that caused great bodily harm or permanent disfigurement. *Daniels*, 2016 IL App (4th) 140131, ¶ 63. This court rejected those arguments and affirmed the trial court. *Id.* ¶ 105.

¶ 36                                    D. Postconviction Proceedings

¶ 37            In August 2017, defendant *pro se* filed a petition for postconviction relief. 725 ILCS 5/122-1 (West 2016). In October 2017, the trial court advanced the petition to the second stage and appointed the public defender as counsel for defendant.

¶ 38            In June 2018, defendant filed an amended postconviction petition in which defendant argued that (1) trial counsel provided ineffective assistance by (a) failing to investigate and present an alibi defense and (b) failing to impeach the testimony of Raymond Davis and (2) defendant is actually innocent as shown by a new affidavit from Jamell Jamison and a recantation from Raymond Davis.

¶ 39            Defendant attached to the petition his own affidavit in which he described that he informed his counsel that he was not involved in the shooting but instead was with Tylon McAllister and Maurice Sutton on Riley Drive. He claimed he never went back to Orchard Road when the others did. Defendant informed his initial attorney of this matter, but after that attorney withdrew, defendant informed his new counsel of the same and mentioned the alibi witnesses. Defendant claimed that despite this, his attorney never contacted McAllister or Sutton. Defendant

further claimed that the driver of the van, Rodney Lane, would be willing to testify that defendant was not in the van when he drove it back to Orchard Road. However, despite his attorney's assurances that Lane would be called as a witness, he was not. Further, defendant said that he told his attorney he wished to testify at trial, but the attorney told him he could not testify that he was not at the scene because they failed to disclose an alibi defense to the State.

¶ 40      Defendant also attached an affidavit written by Maurice Sutton which stated that he was with defendant, Kenny King, Raymond Davis, Jake Williams, and Tylon McAllister at defendant's residence around 4 p.m. on the date of the offense. When they decided to go to the music studio, "Kenny, Raymond and Jake got into a van driven by an older male, whom [he] later learned was Rodney." Sutton said that, meanwhile, he, defendant, and McAllister all got into McAllister's vehicle and waited in defendant's parking lot for a call from Kenny to proceed to the studio. While they waited, defendant's girlfriend arrived and talked with defendant about packing for their pre-planned Florida trip for his birthday. Defendant then went inside the apartment with her. Sutton concluded by saying that he later learned while in custody that defendant was accused of the shooting, but Sutton knew that could not be true. Sutton told defendant he would testify, but he was never contacted by defendant's attorney.

¶ 41      Defendant also attached an affidavit written by Tylon McAllister which described similar events as Sutton, including that the others left to get Kenny King's phone while defendant and Sutton got into McAllister's vehicle to wait. McAllister's affidavit stated that at about 4:30 p.m., defendant's girlfriend Brittany arrived and "insisted that they pack for his birthday trip to Florida." Defendant said he would meet them at the studio, so Sutton and McAllister proceeded without him. McAllister said he was never contacted by anyone about testifying on behalf of defendant, despite being "very insistent on testifying to the above facts."

¶ 42    Defendant also attached an affidavit written by Jamell Jamison which stated that he witnessed the shooting and was familiar with both M.O.B. and B.O.M. He described that he heard the groups were meeting and he hoped that because he was unaffiliated with either group he could help "lessen the conflict." Jamison said he saw both groups approach each other and recognized certain individuals from music videos and he was "certain that pimp was not out there" and was sure that he was not the shooter because the shooter had dreadlocks. Jamison concluded by saying, "I never spoke to the police about this because my friend daveed asked me not to help the mob he is resting in peace now so I feel it's only right to help some one [*sic*] I know who is innocent and in jail for something he did not do."

¶ 43    Finally, defendant attached an affidavit written by Raymond Davis who stated that at trial he had testified that when he traveled to Orchard Road in the van, Rodney Lane drove and he, "S. Dot," and defendant were passengers. Davis stated, "At the time I made these statements to the detectives I didn't believe DeAndre was a defendant in the case and this was my attempt to use him as an alibi. My statements that DeAndre was in the van with us that went to Orchard was false and made under duress." He continued by explaining that he was facing serious prison time due to his criminal record and therefore "decided to testify falsely about DeAndre being with us in the van in exchange for immediate release from jail and a lesser charge that included no prison time." Davis concluded by stating, "The facts are that DeAndre was never in the van and I never seen DeAndre near the scene." Rather, he believed defendant "was in the group that stayed on his street."

¶ 44    In July 2018, the State filed a motion to dismiss defendant's petition.

¶ 45    Later in July 2018, the trial court conducted a hearing on the State's motion to dismiss. Following argument, the court took the matter under advisement before issuing a ruling

in January 2019 in which it granted the State's motion to dismiss.

¶ 46        This appeal followed.

¶ 47                            II. ANALYSIS

¶ 48        On appeal, defendant argues that because (1) his claim of actual innocence was arguably meritorious as shown by a new affidavit from an eyewitness and a recantation from a witness who testified at trial and (2) his petition made a substantial showing of a constitutional violation due to ineffective assistance of counsel because trial counsel (a) failed to investigate and present an alibi defense and (b) failed to impeach the testimony of the same witness who is now recanting, this court should remand and advance the matter to a third-stage hearing. Based upon the Illinois Supreme Court's recent decision in *People v. Robinson*, 2020 IL 123849, we conclude that defendant has made a sufficient showing that he is entitled to a third-stage evidentiary hearing.

¶ 49                            A. The Law

¶ 50        "The Act provides a statutory remedy to criminal defendants who assert claims for substantial violations of their constitutional rights at trial." *People v. Robinson*, 2020 IL 123849, ¶ 42. The Act offers a mechanism for a collateral attack on a final judgment. *Id.* "The question raised in an appeal from an order dismissing a postconviction petition at the second stage is whether the allegations in the petition, liberally construed in favor of the petitioner and taken as true, are sufficient to invoke relief under the Act." *People v. Sanders*, 2016 IL 118123, ¶ 31, 47 N.E.3d 237.

¶ 51        "All well-pleaded factual allegations not positively rebutted by the trial record must be taken as true for purposes of the State's motion to dismiss." *Id.* ¶ 42. "Credibility determinations may be made only at a third-stage evidentiary hearing." *Id.* In *Robinson*, the supreme court clarified that evidence is not "positively rebutted simply because it was contradicted by the evidence

presented at trial." *Robinson*, 2020 IL 123849, ¶ 60. "For new evidence to be positively rebutted, it must be clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible ***." *Id.*

¶ 52    The supreme court explained the standard for actual innocence claims in *Robinson* as follows:

"To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. [Citations.] Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence. [Citation.] Evidence is material if it is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative evidence adds to the information that the fact finder heard at trial. [Citation.] Lastly, the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result. [Citation.] The conclusive character of the new evidence is the most important element of an actual innocence claim. [Citation.]

Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. [Citation.] The new evidence need not be entirely dispositive to be likely to alter the result on retrial. [Citation.] Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence. [Citation.]" *Id.* ¶¶ 47-48.

¶ 53    For a claim of ineffective assistance of counsel, a defendant must show that

- 12 -

(1) counsel's performance was deficient and (2) the deficiency prejudiced the defense. *People v. Dupree*, 2018 IL 122307, ¶ 44, 124 N.E.3d 908. Decisions concerning whether to call certain witnesses are ordinarily strategic decisions of trial counsel to which courts of review offer a "strong presumption that they reflect sound trial strategy, rather than incompetence [citation] and are, therefore, generally immune from claims of ineffective assistance of counsel." *People v. Enis*, 194 Ill. 2d 361, 378, 743 N.E.2d 1, 12 (2000). That presumption is rebutted, however, if trial "counsel's strategy was so unsound that no meaningful adversarial testing was conducted." *Id.*

¶ 54                                    B. The Actual Innocence Claim

¶ 55          In this case, Jamell Jamison came forward several years after trial and explained that he was at the scene of the shooting but did not see defendant there. He said in his affidavit that he went to the scene with David Parks due to a conflict between B.O.M. and M.O.B. Jamison observed the groups meet and recognized several of the people involved. He did not see defendant at the scene. As Jamison stood on the sidewalk, he saw a person with dreadlocks pull out a gun and begin shooting. Jamison said he did not come forward with this information before because he was scared to talk to the police and because a friend of his, who is now deceased, asked him not to help the M.O.B. Now that his friend was deceased and he knew an innocent person was serving a sentence for something he did not do, Jamison decided to come forward with what he knows.

¶ 56          This evidence is clearly newly discovered because Jamison's knowledge and the information contained in his affidavit was discovered long after the trial. The evidence is material and not cumulative because it is related to the identity of the shooter and adds to the information that the jury heard at trial. Finally, this evidence, if it were believed by a jury, would be conclusive, because it would show that defendant was not the shooter and was not even at the scene of the

crime.

¶ 57     We note that this claim of actual innocence is further supported by Raymond Davis's affidavit in which he recants his statement to the police and his trial testimony. Because we conclude that Jamison's affidavit alone meets the criteria to advance the actual innocence claim to the third stage, we need not also address the sufficiency of Davis's affidavit. We conclude that the actual innocence claim must be advanced to the third stage.

¶ 58                    C. The Ineffective Assistance of Counsel Claim

¶ 59     Defendant claims that his trial counsel was ineffective for failing to investigate two witnesses, Maurice Sutton and Tylon McAllister, who would have provided him with an alibi defense. According to defendant, he was not present at the scene of the shooting but was instead at his apartment with McAllister and Sutton. Defendant explained that he gave his trial counsel McAllister and Sutton's contact information, but his counsel did not contact them. Defendant also claimed that he wished to testify at trial as to his alibi, but his trial counsel told him that he could not because counsel had not notified the State or trial court that defendant intended to pursue an alibi defense.

¶ 60     The first question is whether trial counsel's performance was deficient. We conclude that it was. At this stage we must take the information contained in the affidavits as true. *Sanders*, 2016 IL 118123, ¶ 33. To take that information as true does not mean only "that, if called as a witness, the affiant would testify consistently with the content of the affidavit." *Robinson*, 2020 IL 123849, ¶ 59 n.2. "Rather, the well-pleaded allegations in the petition and supporting documents will be accepted as true unless it is affirmatively demonstrated by the record that a trier of fact could never accept their veracity." *Id.* ¶ 60. (We note that although in *Robinson* the supreme court analyzed what it means to accept something as true in a different procedural context, there

is no reason to suspect that that phrase means anything different during the second-stage of postconviction proceedings.) Analyzing Sutton and McAllister's affidavits through that lens, we conclude that neither are affirmatively rebutted by the record, nor are they such that a trier of fact could never accept their veracity. Therefore, accepting the affidavits as true, it was unreasonable for trial counsel to not investigate these individuals to determine whether the alibi defense had merit. This failure is compounded by defendant's claim that he was not allowed to testify as to his alibi because his counsel did not notify the State. Taking that allegation as true, trial counsel engaged in an unreasonable pattern of first not investigating, and then failing to take the steps necessary to present, an alibi defense. If what defendant says is true, the failure appears to be due to a lack of preparation or communication, instead of any legitimate trial strategy.

¶ 61 The second question is whether trial counsel's error prejudiced defendant. Again, when we "accept[ ] as true" the contents of the affidavits, it is clear that the claims contained therein would be sufficient to show "there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different." *Enis*, 194 Ill. 2d at 376.

¶ 62 Although we make no judgment at all as to the ultimate merits of defendant's claim, we conclude that this matter must also advance to a third-stage evidentiary hearing.

¶ 63 III. CONCLUSION

¶ 64 For the reasons stated, we reverse and remand for a third-stage evidentiary hearing.

¶ 65 Reversed and remanded.