NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 200094-U

NO. 4-20-0094

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 6, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| JAKE E. WILLIAMS, | ) | No. 12CF1196 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices Harris and Holder White concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court erred in denying defendant leave to file a successive postconviction
petition.

¶ 2     In April 2013, a jury found defendant, Jake E. Williams, guilty of aggravated

battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2010)) and other weapons-related

offenses after the November 2012 shooting of Marcus Winlow. Defendant sought to overturn his

convictions both on direct appeal and with a petition filed under the Post-Conviction Hearing Act

(Act) (725 ILCS 5/122-1 *et seq.* (West 2014)). Except for one conviction for aggravated

unlawful use of a weapon (see *People v. Williams*, 2015 IL App (4th) 130637-U, ¶¶ 42-43),

defendant's convictions were upheld.

¶ 3     In August 2019, defendant filed a motion for leave to file a successive

postconviction petition under section 122-1(f) of the Act (725 ILCS 5/122-1(f) (West 2018)). In this filing, defendant asserted claims of actual innocence and ineffective assistance of appellate counsel. He attached, among other items, an affidavit by Jamell Jamison. In the affidavit, Jamison identified the shooter with a description that did not match defendant's appearance on the date of the shooting. The trial court denied the petition upon finding the affidavit was not new evidence and was cumulative to evidence the jury heard.

¶ 4        Defendant appeals, arguing he stated a colorable claim of actual innocence. We reverse and remand.

¶ 5                                  I. BACKGROUND

¶ 6                                   A. The Trial

¶ 7        In November 2012, Winlow, a/k/a "Lil Dude," was shot during an altercation between two rival street gangs, Money Over B*** (M.O.B.) and Black Out Mafia (B.O.M.). Winlow was a member of B.O.M.; defendant was a member of M.O.B. Two other members of B.O.M. suffered injuries during the altercation: Robert Jackson, who was shot, and Kaythiese Fitch, a/k/a "KK" (KK) suffered a broken jaw. The altercation occurred in a vacant lot across the street from the apartment complex where Winlow and his mother, Michelle Brown, lived.

¶ 8        For the shooting of Winlow, defendant was initially indicted on four charges: (1) attempt (murder) (720 ILCS 5/8-4, 9-1 (West 2010)) (count I); (2) aggravated battery with a firearm (*Id.* § 12-3.05(e)(1)) (count II); (3) aggravated discharge of a firearm (*Id.* § 24-1.2(a)(2)) (count III); and (4) possession of a firearm by a street-gang member (*Id.* § 24-1.8(a)(1)) (count IV). Two months later, defendant was further indicted on three counts of aggravated unlawful use of a weapon (*Id.* § 24-1.6(a)(1) (West 2010)) (counts V, VI, and VII). The State abandoned

count IV before trial.

¶ 9 Defendant's trial was held in March 2013. At trial, the State's first witness was Eric Riegelein, a Bloomington police officer. Officer Riegelein testified he was the first officer to respond to the dispatch to 1213 or 1215 Orchard Road. He arrived at the scene "[o]nly a few minutes" after receiving the call. Officer Riegelein blocked the street with his squad car and observed Winlow lying in the street. Winlow's mother was tending to Winlow, who had been shot in the back. Approximately 8 to 12 people were standing nearby. Officer Riegelein observed Jackson, who was leaning against a car, had been shot in the thigh.

¶ 10 Michael Luedtke, a Bloomington police officer, testified he responded to a call to the 1200 block of Orchard Road around 4:15 p.m. on November 5, 2012. He arrived at almost the same time as Officer Riegelein. Officer Luedtke testified Brown was leaning over Winlow yelling he had been shot. Brown reported "she was walking outside the apartment building when she saw the group run up and start shooting." Brown named "Jake, Kenny, S-Dot, Pimp, and Play" as suspects. Brown told Officer Luedtke defendant ran up to Winlow and shot him in the back. Brown identified "Pimp" as Deandre Daniels and said he shot Jackson five times. Officer Luedtke observed only one bullet in Jackson's leg. Brown initially hesitated to make a statement at the police station but then agreed. According to Officer Luedtke, Brown was the only one who identified the shooters at the scene.

¶ 11 Clayton Arnold, a detective and crime-scene technician with the Bloomington Police Department, testified he arrived at the scene at 4:30 p.m. Three spent .45-caliber shell casings were found in the old parking lot area of the Holiday Inn Hotel. The shell casings "were positioned in a straight line *** northeast to southwest." The person was moving forward or

retreating while firing. A bullet hole was found in a fence to the northeast of where the three shell casings were found. The casings were three or four feet apart. He had no knowledge of whether the casings were matched to a weapon.

¶ 12 Brown testified she resided in Apartment 2 at 1213 Orchard Road with her three minor children. Her son Winlow, age 19 on the date of the shooting, lived in an apartment across the hall with his girlfriend, Estes Anderson. Brown knew defendant's mother, Ervina Daniels, "half my life." Brown also knew Daniels's other sons, Deandre Daniels, a/k/a "Pimp," and Antoine Smith, a/k/a "Play."

¶ 13 According to Brown, she was testifying because of a subpoena. She did not want to be in court. A little before 4 p.m., on November 5, 2012, Brown was in her apartment. Her three younger children were with her. Winlow, with KK, had been there earlier that afternoon. Winlow reported he had been in a fight. Brown observed a knot on Winlow's head. The children arrived home from school a little after 3:45 p.m. Brown was preparing to head to the bus stop. One of her children ran into the apartment and told Brown her son had been shot. Brown did not hear gunshots. Brown ran to Winlow, who was lying on his stomach. Winlow was shot on his side and the bullet exited his back. There were "a lot of people around." Brown could not say how much time passed between the time she got to Winlow and when the police arrived. Brown was yelling, but she did not recall what she was yelling. Brown agreed she talked to the police at the scene. She named names, but Brown testified she was not present and did not actually see the shooting. When asked if she told Officer Luedtke defendant was there, Brown testified, "I was going by hearsay and making up my own story *** because I wanted somebody, you know, to go down." She named "possibly the whole crew," referring to M.O.B.

¶ 14            Brown acknowledged she consented to be interviewed at the Bloomington Police Department that same day. She knew the interview would be recorded. Brown agreed she provided "a lot of details" in the interview. She reported walking to the bus stop when she saw Winlow and KK, who were in front of her. Brown acknowledged she "probably" reported defendant pulled out a gun and shot Winlow in the back after Winlow turned to flee. Brown agreed she "probably" conversed with someone over her phone while in the interview room. When asked if she told the person on the phone "it happened right in front of your face," Brown testified, "I'm not quite sure," but agreed she probably said that. Brown said she was lying to that individual, as well, stating, "I wanted somebody to go down, and I knew I was being recorded." Brown did not remember telling the person on the phone, "you can call me a snitch if you want to. I am a snitch." She was "not quite sure" she made the statement. Brown acknowledged she identified defendant as the shooter from a photo.

¶ 15            Regarding the grand jury proceedings, Brown testified she recalled telling the grand jury she walked behind Winlow and K.K. and saw them stop to talk to a friend. Brown testified before the grand jury a group of men walked around the corner and both groups "scattered out onto the field." Brown agreed she said defendant approached Winlow and shot him. During trial, however, Brown denied witnessing the shooting. Brown testified she did not leave her apartment until after the shooting and was repeating what she heard. Brown testified she wrote a recantation to try to set things right. Brown stated she provided information of which she did not have personal knowledge.

¶ 16            Brown agreed she wrote a letter, dated December 11, 2012, recanting the statements she made to the police and to the grand jury. The letter reads as follows:

"I, Michelle Brown, [am] serving as a witness in a felony case in which my son, [Winlow], was the victim. I am choosing to remove my statement as the witness in this case. My son had been shot in a result of a fight, and I was very frustrated and confused at the time the original statement was written. I began to name several gentlemen who had previously been in verbal altercations with [Winlow]. I did not see these gentlemen: [defendant], Deandre Daniels, Quinshawn Gardner [(S-Dot)], Antoine Smith, Kenneth King, or Raymond Davis at the crime scene. I do not hold any of these men accountable for the crime, and according to me they are not defendants in this case. I will not be attending trial as a witness, nor testifying, I would like for all charges to be dropped. Lastly, I am not being forced by anyone to remove my statement nor have I been promised anything in return to withdraw this statement and I do not feel threatened nor that my life is in danger. I would like all the gentlemen upon release to be ordered to attend several churches and give their testimonies why they thank God for a second chance at life."

¶ 17 Steven Fanelli, a detective with the Bloomington Police Department, testified he was assigned to interview Brown. Detective Fanelli identified the video he recorded of that interview. The video was played for the jury.

¶ 18 The recording shows Brown sitting in the interview room alone. In those few

minutes she was waiting, Brown received multiple calls on her cell phone. Brown answered those calls. During the first call, the caller can be heard talking about the initial confrontation that occurred before the shooting. She explained to Brown that Kenny had knocked on her door, looking to fight. Brown put this call on hold to take another call.

¶ 19　　　　During the second call, the caller asked Brown if she was all right. Brown responded affirmatively and said, "I just saw it ***. It's crazy." During the fourth call, Brown told the caller, "They just shot Lil Dude up in his back." Brown received a fifth call. During this conversation, Brown stated, "I was there. I saw everything with my own two eyes. I thought I was about to get shot." Brown further stated to the caller after "it was over," she attempted to collect jackets from the ground and must have picked up S-Dot's jacket because he pointed a gun at her and said, "Put my coat down you bitch." She threw his coat on the ground.

¶ 20　　　　Detective Fanelli entered the room. Brown told Detective Fanelli what she heard regarding the earlier altercation involving Winlow. According to Winlow's girlfriend, Winlow and KK were challenged to a fight by two individuals, Raymond and Kenny. Brown was told Kenny knocked on Winlow's door looking to fight, but Winlow told Kenny he did not want to fight. Winlow eventually fought Raymond while KK and Kenny fought.

¶ 21　　　　A short time later, Winlow arrived at Brown's with a knot on his head. Brown believed the dispute was over. She left with Winlow and KK to walk to the bus stop to run some errands. A group of men, including defendant, Davis, Kenny, Anthony Smith, S-Dot, Antoine Smith (a/k/a "Play"), and Deandre Daniels (a/k/a "Pimp"), walked around the corner and confronted Winlow and KK. Defendant and Winlow squared up to fight, while KK and Antoine began to fight. Defendant pulled out a gun and shot Winlow in the back. Others pulled out their

guns and waved them around. Defendant ran off while Deandre fired his gun four times.

¶ 22     Detective Fanelli left the room around the 28-minute mark. Brown took another call. During this call, Brown again described the shooting and identified defendant as the shooter. Brown told the caller it happened in front of her. Brown also told the caller, "Yes, I am. You can call me what you want to. I am a snitch about mine, you most definitely right." Brown stated four of the men had guns but only defendant and Deandre fired their guns.

¶ 23     Detective Fanelli reentered the room with photos. Brown identified defendant in a photo and stated defendant shot her son. Brown reported defendant used to have "dreads" but, on the date of the shooting, he had a short afro. Kenny did not have a gun.

¶ 24     Winlow testified under subpoena. He and defendant grew up together. They were not friends, but Winlow did not dislike him. When ask if they were just acquaintances, Winlow responded, "We just cool. We just cool. We play ball together." Winlow testified he and defendant had been in a fist fight before. They "were just playing." On previous occasions, Winlow fought with Robert Jackson, KK, and Da'vid Parks. (We note Parks appears in the record as Da'vid Parks, Daveed Parks, and David Parks.) They probably fought "over a girl." But then they "suck it up because we friends." The day of the shooting, Winlow wrestled with defendant.

¶ 25     When the shooting occurred, Winlow saw approximately 20 people coming out of the field dressed in all black and wearing ski masks. They all had guns. Winlow was asked what he was doing. Winlow ran and then was shot. Because of the masks, Winlow could not identify anyone.

¶ 26     Kaytrel Fitch testified he was present when the Orchard Road shooting took

place. Kaytrel resided at 1213 Orchard Road. KK is Kaytrel's brother. On November 5, 2012, Kaytrel was home sleeping. KK woke Kaytrel to tell him he had been jumped. Kaytrel went outside with KK. "[A] bunch of guys came around the corner" and walked "[t]o the field across the street from [his] house." KK went across the field two to three minutes later. KK began fighting with someone. Kaytrel ran over to help his brother when he heard a gunshot. Kaytrel grabbed KK and they ran. Kaytrel saw Winlow and defendant at the scene. Both were "just standing." Kaytrel did not see a gun or the shooter.

¶ 27        Brentais Hawkins testified defendant admitted shooting Winlow. Hawkins testified he was incarcerated in December 2012 for burglary. At the time of his testimony in the trial, Hawkins was incarcerated for failure to report to pretrial services. In 2006 to 2007, Hawkins lived with defendant's mother, Ervina. At that time, two of Ervina's children lived there as well. Hawkins was acquainted with Ervina's other children, including defendant. He saw defendant occasionally when he visited, about once or twice per week. Hawkins did not consider himself a fatherly figure to Ervina's children.

¶ 28        According to Hawkins, around December 13 or 14, 2012, defendant and Hawkins were in the west pod of the county jail together for approximately one week. Hawkins agreed he and defendant "would socialize and talk and hang out together." They talked "[p]robably once or twice, about 20 or 30 minutes" in total. Defendant told Hawkins he and some members of M.O.B. were in a fight with B.O.M. Hawkins thought "it had something to do with a rap battle." The fight occurred on Orchard Road. Defendant told Hawkins: "[T]hey [were] fighting, and one of the opposing mob members was getting the best of someone. He shot at him." When asked if defendant told Hawkins what gun he used to shoot Winlow, Hawkins said, "I believe it was a

380 handgun." Defendant testified "they jumped in the van and they drove off."

¶ 29        Hawkins admitted he had a domestic battery conviction and the victim in that case was defendant's mother. Hawkins admitted multiple felony convictions including obstructing justice by providing false information, possession of a stolen motor vehicle, aggravated reckless driving, theft, and aggravated battery. Hawkins testified as follows:

> "Q. And while you've testified that you haven't been promised anything, you're hoping and you're expecting that your cooperation in this matter will be made known to your attorney and to the judge who sentences you or the prosecutor handling your case, correct?
>
> A. I believe, but I wasn't told any of that.
>
> Q. You weren't told that, but you're expecting that, correct?
>
> A. Hoping, yeah.
>
> Q. And you're hoping that basically your cooperation here will help you in your case to get less of a sentence than you might normally be looking at because of your lengthy criminal history ***; is that correct?
>
> A. Yes."

¶ 30        Richard R. Barkes, a detective with the Bloomington Police Department, testified defendant was arrested on November 6, 2012, for failure to show in court on another matter. Detective Barkes testified the interview was video recorded. The interview was played for the

jury. During the interview, defendant changed his story multiple times. He admitted to lying when he changed his story. Defendant first denied being at the scene and having any knowledge of the shooting. Later, he admitted being at the scene and fighting someone. Defendant stated Parks shot Winlow. After defendant admitted being at the scene, defendant told the interviewer he wore a red Hollister sweatshirt.

¶ 31        Video surveillance footage, introduced by the State, shows defendant leaving the Bloomington Law and Justice Center around 2 p.m. on the date of the shooting. In that video, defendant was wearing a red Hollister sweatshirt and his hair was cut short.

¶ 32        Police recovered a red Hollister sweatshirt from defendant's residence on November 6, 2012. The cuffs of the red Hollister sweatshirt, tested in January 2013, tested negative for gunshot residue. The expert who conducted the testing explained gunshot residue may not appear on a sweatshirt if the sleeves were pushed up during the shooting or the residue fell off after having been shaken or worn since the shooting.

¶ 33        The defense rested without presenting any evidence. The jury found defendant not guilty of attempt (first degree murder) but guilty of all other counts. Defendant was sentenced to 18 years' imprisonment for aggravated battery and a concurrent 3-year term for aggravated unlawful use of a firearm.

¶ 34                                B. Direct Appeal

¶ 35        In his direct appeal, defendant asked this court to find plain error occurred when the trial court admitted two consistent statements Brown made identifying defendant as the shooter of Winlow. We found the issue waived as trial counsel expressly agreed the jury could consider the interview and the grand jury testimony. *Williams*, 2015 IL App (4th) 130637-U,

¶¶ 30, 36.

¶ 36 Also in his appeal, defendant argued his conviction for aggravated unlawful use of a weapon violated the one-act, one-crime rule. *Id.* ¶ 2. In considering this issue, we observed the Illinois Supreme Court held unconstitutional on its face the section of the statute for which defendant was convicted of one count of aggravated unlawful use of a weapon. *Id.* ¶ 41 (citing *People v. Aguilar*, 2013 IL 112116, ¶ 22, 2 N.E.3d 321). We reversed the conviction on that charge but upheld the other two aggravated-unlawful-use-of-a-weapon convictions. *Id.* ¶ 2.

¶ 37 C. Initial Postconviction Petition

¶ 38 In his *pro se* postconviction petition, defendant argued, in part, trial counsel provided ineffective assistance when counsel failed to object "to improper hearsay recordings of [an] inconsistent witness." *People v. Williams*, 2018 IL App (4th) 160154-U, ¶ 2. The trial court summarily dismissed the petition, finding the statements admissible. *Id.* We affirmed the dismissal upon concluding defendant argued on appeal an argument that did not appear on the face of the postconviction petition. *Id.* ¶¶ 3, 38, 42.

¶ 39 D. Leave to File a Successive Postconviction Petition

¶ 40 On August 22, 2019, defendant filed a *pro se* motion for leave to file a successive postconviction petition. Defendant's filings raise two claims: (1) actual innocence based on newly discovered evidence and (2) ineffective assistance of appellate counsel on direct appeal.

¶ 41 To support his claim of actual innocence, defendant attached three documents. The first is a May 16, 2018, affidavit from Jamell Jamison.

¶ 42 Attached to the proposed successive petition is, in part, an affidavit signed by Jamell Jamison. The affidavit consists of one paragraph with no punctuation and multiple

grammatical, capitalization, and spelling errors. It states the following, with no corrections or additions made by this court:

"In Early November of 2012 I witnessed a shooting involving the mob and bom of the Bloomington area although Iam not affiliated with either group I know of both groups threw there music On the day of the shooting I was told by DAVID parks that they were meeting up with the mob to squash their beef I was meeting up with them because I am not enemies of either group and hoped my presence could lessen the conflict *As I was on orchard I seen the two groups* approach each other with what seemed like a talk I was not with either group but was on the side walk as the groups met up out of the groups *I seen people that I recognized from music videos and Iam certain that pimp was not out there Iam positive he wasn't the shooter either* as I stood on orchard with daveed who ran towards the fight I seen some one *who had dread locks pull out a gun and shoot he shot multiple times* and everybody accept him ran I dropped my cell phone and was scared to let the police know that I was a witness so I never asked for me property back I never spoke to the police about this because my friend daveed asked me not to help the mob he is resting in peace now so I feel it's only right to help some one I know who is innocent and in jail for something he did not do."

- 13 -

¶ 43    In his petition, defendant argues the affidavit supports his claim as it contradicts Brown's claim, as well as her video-recorded statement to the police and her grand jury testimony that there were two shooters. In addition, Jamison described the shooter as having dreadlocks, while the trial evidence shows defendant had short hair at the time of the shooting.

¶ 44    Defendant also attached a McLean County incident report completed by Detective Jared Roth on December 13, 2012. According to the report, Detective Atteberry obtained a search warrant "in regards to information he received about a gun believed to be connected with the shooting on Orchard Street in November 2012." The Bloomington Police Department SWAT executed a search warrant on "a subject by the name of Style Gray." While Gray was "being taken to the ground," a .45-caliber Colt Double Eagle handgun fell from Gray. During an interview, Gray stated he purchased the gun for protection due to the shootings that occurred during the summer of 2012. He purchased the gun from Ladika Tolise for $500. Gray said the gun remained in his apartment or with him from the time of purchase until the date of the report.

¶ 45    Defendant contends this gun was used by Marshall Smith in a shooting that occurred in August 2012. The brief filed by the Office of the State Appellate Defender states defendant's filings do not show if Style Gray and Marshall Smith are the same individual or are different people. Defendant's filing cites the case of Marshall Smith by its McLean County case number. An unpublished order under Illinois Supreme Court Rule 23 (Jan. 1, 2021) with the same circuit court number and involving "Marshall Smith" clarifies that Gray and Smith are two different people. See *People v. Smith*, 2016 IL App (4th) 140520-U, ¶¶ 2, 15.

¶ 46    Defendant's argument is that the police, when looking for the gun used in the Orchard Road shooting, found the gun on Gray in December 2012. This same gun was used in an

August 2012 shooting by Smith, for which Smith was convicted of aggravated battery with a firearm and aggravated discharge of a firearm. See *Smith*, 2016 IL App (4th) 140520-U, ¶ 15. Defendant contends Smith, who matched the description of the shooter as described by Jamison and Brandi Guzouski, shot Winlow.

¶ 47　　　　Defendant also attached an incident report from the Orchard Road shooting prepared by William Buchanan, an officer with the Bloomington Police Department. According to the report, Officer Buchanan made contact with an unnamed woman. Defendant contends this woman is Brandi Guzouski, whom the State's answer to discovery describes as residing at 1214 Orchard Road. According to this report, the woman stated she was sitting on her couch with her child when she heard five gunshots. She looked out her balcony window, which overlooked the vacant lot and Orchard Road. The woman observed a black male, wearing a plain white T-shirt and dark pants "with dreadlocked hair approximately jaw-line length" walking northbound on the sidewalk. This male was moving rapidly but stopped at times to crouch down. This male pointed the gun at others at times. The witness observed the male fire the gun.

¶ 48　　　　In his proposed successive petition, defendant asserts Guzouski's account matches the physical evidence. Guzouski stated one shooter was moving rapidly, and the trial evidence shows only one set of shell casings was found. Defendant asserts there was no reasonable explanation as to why counsel would not subpoena and secure testimony from an eyewitness who had no credibility concerns.

¶ 49　　　　As to his claim of ineffective assistance of appellate counsel, defendant asserts appellate counsel was ineffective for not alleging ineffectiveness of trial counsel based on trial counsel's failure to (1) subpoena Guzouski to testify and (2) object to the admission of Brown's

statements to the police and grand jury testimony. Defendant argues these shortcomings, as well as his mental illness, prevented him from raising these claims earlier. In support of this claim, defendant attached to his motion for leave the results of a May 2019 psychiatric evaluation from the Illinois Department of Corrections.

¶ 50 In December 2019, the trial court denied defendant's motion for leave to file a successive postconviction petition. The court found the evidence offered by defendant was available to defendant at the time of trial. The court found the conviction of Marshall Smith was not evidence showing petitioner's actual innocence. That Smith may have been convicted of using a gun involved in the Orchard Road shooting does not show actual innocence but simply adds to the evidence the jury heard at trial. The court emphasized defendant acknowledged as much in his petition.

¶ 51 As to the Jamison affidavit, the trial court concluded it was "not new" and did not establish actual innocence. The court emphasized Jamison was at the shooting and no explanation was provided as to why Jamison was not available to testify at defendant's trial. The court further found Jamison's testimony was simply cumulative to evidence the jury already heard. The court further found the ineffective-assistance-of-counsel claims were barred as they were raised or could have been raised in the previous proceedings.

¶ 52 This appeal follows.

¶ 53 II. ANALYSIS

¶ 54 A. Standard of Review

¶ 55 The denial of a motion for leave to file a successive postconviction petition alleging actual innocence is reviewed *de novo*. *People v. Robinson*, 2020 IL 123849, ¶ 39.

¶ 56                          B. The Post-Conviction Hearing Act

¶ 57          Under the Act, criminal defendants have a statutory remedy to "assert claims for

substantial violations of their constitutional rights at trial." *Id.* ¶ 42. The Act contemplates the

filing of only one postconviction petition. *People v. Shotts*, 2015 IL App (4th) 130695, ¶ 63

(quoting 725 ILCS 5/122-1(f) (West 2012)). There are, however, two means by which an

additional or successive postconviction petition may be considered with leave of court. *Id.* One

of these bases, the one relevant here, is the "fundamental miscarriage of justice" exception,

which requires proof of actual innocence. *People v. Edwards*, 2012 IL 111711, ¶ 23, 969 N.E.2d

829.

¶ 58          When a petitioner requests leave to file a successive postconviction petition

asserting a claim of actual innocence, "leave of court should be denied only where it is clear,

from a review of the successive petition and the documentation provided by the petitioner that, as

a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *Id.* ¶ 24;

see also *Robinson*, 2020 IL 123849, ¶ 44 ("A request for leave to file a successive petition should

be denied only where it is clear from a review of the petition and supporting documentation that,

as a matter of law, the petition cannot set forth a colorable claim of actual innocence."). This

requires asking whether "petitioner's request for leave of court and his supporting documentation

raise the probability that it is more likely than not that no reasonable juror would have convicted

him in light of the new evidence." *Id.* ¶ 31. To establish a claim of actual innocence, the evidence

must be " 'newly discovered'; material and not merely cumulative; and of such conclusive

character that it would probably change the result on retrial." *Id.* ¶ 32. We are mindful at the

pleading stage of proceedings under the Act, we must take as true all well-pleaded allegations in

- 17 -

the petition and supporting affidavits unless they are positively rebutted by the trial record. *Robinson*, 2020 IL 123849, ¶ 45.

¶ 59    Defendant contends, at this stage, to satisfy the "colorable" threshold he need only establish it is *arguable* the evidence was newly discovered, *arguable* the evidence was material and not cumulative, and *arguable* the evidence would change the result on retrial. See *People v. Hodges*, 234 Ill. 2d 1, 17, 912 N.E.2d 1204, 1212 (2009) (holding at the first stage of proceedings under the Act, a petition alleging an ineffectiveness claim need only show it is arguable counsel's performance was objectively unreasonable and arguable the petitioner suffered prejudice). The Illinois Supreme Court, however, has expressly rejected this approach. According to the court in *Edwards*, the "arguable" first-stage analysis is not appropriate for consideration of whether leave of court should be granted. *Edwards*, 2012 IL 111711, ¶ 27 ("[T]here is simply no basis in the statute for applying a first-stage analysis to a *successive* petition." (Emphasis in original.)). "Arguable" and "colorable" in the context of the Act are not interchangeable. Defendant must establish a "colorable claim of actual innocence." *Id.* ¶¶ 27-28.

¶ 60                         1. *Newly Discovered*

¶ 61    Evidence will be considered "newly discovered" if it "was discovered after trial and *** the petitioner could not have discovered [it] earlier through the exercise of due diligence." *Robinson*, 2020 IL 123849, ¶ 47.

¶ 62    Defendant contends the Jamison affidavit is newly discovered evidence. Defendant emphasizes the language in the affidavit showing Jamison was unwilling to disclose his personal knowledge of the shooting while Parks was alive. Defendant further points to this court's decision in Deandre's appeal of the summary dismissal of his postconviction petition in

- 18 -

which we found the same affidavit to be newly discovered evidence. See *People v. Daniels*, 2020 IL App (4th) 190723-U, ¶ 56 ("This evidence is clearly newly discovered because Jamison's knowledge and the information contained in his affidavit was discovered long after the trial.").

¶ 63    In contrast, the State directs this court to the *Edwards* decision and counters that the evidence is not newly discovered as defendant has not shown he could not have discovered the evidence earlier by exercising due diligence. According to the State, the record shows defendant was plainly aware of Parks, mentioned in Jamison's affidavit, and failed to subpoena him. The State concludes had defendant issued that subpoena he would likely have learned of Jamison's presence at the scene and could have discovered this evidence. The State further points to the fact Jamison mentions he lost a cell phone at the scene of the crime and the record shows a phone was recovered. The State maintains due diligence required defendant to use that phone to ascertain the owner.

¶ 64    *Edwards* is factually distinguishable from this case. In *Edwards*, the petitioner sought leave to file a successive postconviction petition with a claim of actual innocence. *Edwards*, 2012 IL 111711, ¶ 1. The purported newly discovered evidence was affidavits by two alibi witnesses who averred the petitioner was with them at the time of the offense for which the defendant was convicted. *Id.* ¶ 12. The petitioner argued the evidence was unavailable at trial as, though he knew the identities of the affiants at the time of his trial, they refused his counsel's attempts to persuade them to testify. *Id.* ¶ 35. The Court rejected this argument and found no due diligence as the record did not reveal the petitioner's attorney attempted to subpoena the affiants to testify and no explanation was provided as to why such subpoenas were not issued. *Id.* ¶ 36.

¶ 65    In this case, unlike in *Edwards*, the record does not reveal defendant knew the

- 19 -

affiant was at the scene and had personal knowledge of the shooting. The State's argument seems to concede as much, as it contends defendant should have issued a subpoena to Parks whose testimony then could have led to the discovery of Jamison as a witness. Here, it is too speculative to say that Parks, if issued a subpoena, would have testified that Jamison was present at the shooting. Similarly, too, it does not show a lack of diligence that had defendant traced the phone he would have found Jamison. Again, this argument is entirely speculative. We would have to assume the phone, which is shown in the photo in two pieces, was traceable despite the fact the police did not identify at trial anyone as the owner of the phone. We further note Jamison's affidavit shows he did not seek his lost phone. On the face of the petition and supporting documents, unrefuted by the record, due diligence was satisfied. As in *Daniels*, this evidence is newly discovered.

¶ 66                                    2. *Material and Not Cumulative*

¶ 67            This material-and-not-cumulative element is satisfied if the evidence "is relevant and probative of the petitioner's innocence" and "adds to the information that the fact finder heard at trial." *Robinson*, 2020 IL 123849, ¶ 47.

¶ 68            Defendant argues this evidence is material and not cumulative to evidence the jury heard at trial. We agree. There was no witness testimony that "the shooter" had dreadlocks. The jury did not hear direct testimony that there was one shooter and that the shooter was described as someone that did not match the defendant's appearance on the day of the shooting. Accepting the allegations as true, this element is satisfied.

¶ 69                                    3. *Conclusive Character*

¶ 70            To find the conclusive-character element satisfied, we must find the evidence,

"when considered along with the trial evidence, would probably lead to a different result." *Robinson*, 202 IL 123849, ¶ 47. This element "is the most important element of an actual innocence claim." *Id.* "[T]he question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 48. "The new evidence need not be entirely dispositive to be likely to alter the result on retrial." *Id.* "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.*

¶ 71 Defendant argues this new evidence, when considered with the evidence at trial, establishes there was one shooter and defendant did not match the description of that shooter. According to defendant, this evidence "would probably lead to a different result" at trial.

¶ 72 The State disagrees. The State contends the jury heard numerous versions of the Orchard Road shooting and Jamison's affidavit "would present yet another unbelievable version of events that is positively rebutted by eyewitness testimony and defendant's confession." The State further contends Jamison's affidavit does not rule out a second shooter and does not remove defendant from the scene.

¶ 73 At this stage, the pleading stage, we take as true the allegations in the supporting affidavit. See *id.* ¶ 83. We also must not engage in any credibility determinations. See *id.* Without engaging in a credibility determination, we cannot assess Jamison's veracity or the reliability of the affidavit. Jamison's affidavit plainly refers to one shooter: "the shooter." Jamison's affidavit, taken as true and when considered with the trial evidence that establishes defendant's hair was short, rules defendant out as "the shooter." Other evidence that supports

- 21 -

defendant's contention of actual evidence includes the fact that his sweatshirt, the one he was proved to have been wearing just two hours before the shooting, had no evidence of gunshot residue and only three casings from one weapon were found at the scene.

¶ 74        To find Jamison's affidavit not exculpatory, we would violate the mandate to take those allegations as true. See generally *id.* We would also have to engage in an improper credibility determination, weighing Brown's recanted statements to the police and the grand jury against Jamison's sworn testimony and Brown's trial testimony. We also would have to discredit Jamison's testimony with the testimony of Hawkins, a repeated felon with multiple convictions, including one for providing false information. At this stage, such analysis is improper.

¶ 75        The trial court erred in denying defendant leave to file a successive postconviction petition.

¶ 76                              III. CONCLUSION

¶ 77        We reverse and remand for further proceedings under the Act.

¶ 78        Reversed and remanded.