NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230115-U

NO. 4-23-0115

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 30, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | McLean County |
| JAKE E. WILLIAMS, | ) | No. 12CF1196 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

_____

JUSTICE KNECHT delivered the judgment of the court.
Justices Harris and Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err in denying defendant's petition after a third-stage hearing on defendant's successive postconviction petition.

¶ 2        In January 2023, the trial court denied defendant's successive postconviction petition after holding a third-stage evidentiary hearing under section 122-6 of the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-6 (West 2022)). Defendant appeals, arguing (1) the testimony of eyewitness Jamelle Jamison rules defendant out as the shooter and establishes his innocence and (2) he is entitled to a new evidentiary hearing as the court denied the petition based on an incorrect recollection of the evidence. We affirm.

¶ 3                                I. BACKGROUND

¶ 4                                A. The Trial

¶ 5　　　　On November 5, 2012, Marcus Winlow, a/k/a "Lil Dude," was shot during an altercation between two rival street gangs, Money Over B\*\*\* (M.O.B.) and Black Out Mafia (B.O.M.). Winlow was a member of B.O.M.; defendant was a member of M.O.B. Two other members of B.O.M. suffered injuries during the altercation: Robert Jackson, who was shot, and Kaythiese Fitch, a/k/a "KK," who suffered a broken jaw. The altercation occurred in a vacant lot across the street from the apartment complex where Winlow and his mother, Michelle Brown, lived.

¶ 6　　　　For the shooting of Winlow, defendant was initially indicted on four charges: (1) attempt (first degree murder) (720 ILCS 5/8-4, 9-1 (West 2010)) (count I), (2) aggravated battery with a firearm (*id.* § 12-3.05(e)(1)) (count II), (3) aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)) (count III), and (4) possession of a firearm by a street-gang member (*id.* § 24-1.8(a)(1)) (count IV). Two months later, defendant was further indicted on three counts of aggravated unlawful use of a weapon (*id.* § 24-1.6(a)(1)) (counts V, VI, and VII). The State abandoned count IV before trial.

¶ 7　　　　Defendant's trial was held in March 2013. At trial, the State's first witness was Eric Riegelein, a Bloomington police officer. Officer Riegelein testified he was the first officer to respond to the scene, arriving "[o]nly a few minutes" after receiving the call. Officer Riegelein blocked the street with his squad car. He saw Brown tending to Winlow, who had been shot in the back. Approximately 8 to 12 people were standing nearby. Jackson had been shot in the thigh.

¶ 8　　　　Michael Luedtke, a Bloomington police officer, testified he responded to the scene at almost the same time as Officer Riegelein. Officer Luedtke testified Brown was yelling Winlow had been shot. Brown said "she was walking outside of the apartment building when she

saw the group run up and start shooting." Brown identified "Jake, Kenny, S-Dot, Pimp, and Play" as suspects, telling Officer Luedtke defendant ran up to Winlow and shot him in the back. Brown identified "Pimp" as Deandre Daniels and said he shot Jackson five times. Officer Luedtke observed only one bullet in Jackson's leg. Brown initially hesitated to make a statement at the police station but then agreed. Brown was the only person to identify shooters at the scene.

¶ 9 Clayton Arnold, a detective and crime-scene technician with the Bloomington police department, testified three spent .45-caliber cartridge cases were found in the old parking lot area of the Holiday Inn hotel. The cartridge cases "were positioned in a straight line *** northeast to southwest." The person was moving forward or retreating while firing. A bullet hole was found in a fence to the northeast of where the three cartridge cases were found. The cartridge cases were three or four feet apart. He had no knowledge of whether they were matched to a weapon.

¶ 10 Brown testified she resided in apartment No. 2 at 1213 Orchard Road with her three minor children. Her son Winlow, age 19 on the date of the shooting, lived in an apartment across the hall with his girlfriend, Estes Anderson. Winlow knew defendant's mother, Ervina Daniels, "half my life." Brown also knew Ervina's other sons, Deandre Daniels, a/k/a "Pimp," and Antoine Smith, a/k/a "Play."

¶ 11 According to Brown, she was testifying under subpoena. A little before 4 p.m. on November 5, 2012, Brown was in her apartment. Her three younger children were with her. Winlow, with Kaythiese, had been there earlier that afternoon. Winlow reported he had been in a fight. Brown observed a knot on Winlow's head. The children arrived home from school a little after 3:45 p.m. Brown was preparing to go to the bus stop. Around 4 p.m., one of Brown's children ran into the apartment and told Brown her son had been shot. Brown did not hear

gunshots. Brown ran to Winlow, who was lying on his stomach. Winlow was shot on his side and the bullet exited his back. There were "a lot of people around." Brown could not say how much time passed between the time she got to Winlow and the time police arrived. Brown was yelling, but she did not recall what she was yelling. Brown agreed she talked to the police at the scene. She named names, but Brown denied being present or seeing the shooting. When asked if she told Officer Luedtke defendant was there, Brown testified, "I was going by hearsay and making up my own story *** because I wanted somebody, you know, to go down." She named "possibly the whole crew," referring to M.O.B.

¶ 12         Brown acknowledged she consented to a recorded interview on the day of the shooting at the Bloomington Police Department. Brown agreed she provided "a lot of details" in the interview. She reported walking to the bus stop when she saw Winlow and Kaythiese, who were in front of her. Brown acknowledged she "probably" reported defendant pulled out a gun and shot Winlow in the back after Winlow turned to flee. Brown agreed she "probably" conversed with someone over her phone while in the interview room. When asked if she told the person on the phone "it happened right in front of your face," Brown testified, "I'm not quite sure," but she agreed she probably said that. Brown said she was lying to that individual as well, stating, "I wanted somebody to go down, and I knew I was being recorded." Brown did not remember telling the person on the phone, "you can call me a snitch if you want to. I am a snitch." She was "not quite sure" she made the statement. Brown acknowledged she identified defendant as the shooter from a photo.

¶ 13         Regarding the grand-jury proceedings, Brown testified she recalled telling the grand jury she walked behind Winlow and Kaythiese and saw them stop to talk to a friend. Brown testified before the grand jury a group of men walked around the corner and both groups

"scattered out onto the field." Brown agreed she said defendant approached Winlow and shot him. During trial, however, Brown denied witnessing the shooting. Brown testified she did not leave her apartment until after the shooting and was repeating what she heard. Brown testified she wrote a recantation to try to set things right. Brown stated the information she provided at the grand-jury proceedings was provided by others, not by what she saw.

¶ 14 Brown agreed she wrote a letter, dated December 11, 2012, recanting the statements she made to the police and to the grand jury. The letter reads as follows:

"I, Michelle Brown, [am] serving as a witness in a felony case in which my son, [Winlow], was the victim. I am choosing to remove my statement as the witness in this case. My son had been shot [as] a result of a fight, and I was very frustrated and confused at the time the original statement was written. I began to name several gentlemen who had previously been in verbal altercations with [Winlow]. I did not see these gentlemen: [defendant], Deandre Daniels, Quinshawn Gardner [(S-Dot)], Antoine Smith, Kenneth King, or Raymond Davis at the crime scene. I do not hold any of these men accountable for the crime, and according to me they are not defendants in this case. I will not be attending trial as a witness, nor testifying, I would like for all charges to be dropped. Lastly, I am not being forced by anyone to remove my statement nor have I been promised anything in return to withdraw this statement and I do not feel threatened nor that my life is in danger. I would like all the gentlemen upon release to be ordered to attend

several churches and give their testimonies why they thank God for a second chance at life."

¶ 15      Steven Fanelli, a detective with the Bloomington Police Department, testified he was assigned to interview Brown. Detective Fanelli identified the video he recorded of that interview. The video was played for the jury.

¶ 16      The recording shows Brown sitting in the interview room alone. In those few minutes she was waiting, Brown received multiple calls on her phone. Brown answered those calls. During the first call, the caller can be heard talking about the initial confrontation that occurred before the shooting. Brown put this call on hold to take another call.

¶ 17      During the second call, the caller asked Brown if she was all right. Brown responded affirmatively and said, "I just saw it ***. It's crazy."

¶ 18      During the fourth call, Brown told the caller, "They just shot Lil Dude up in his back." Brown received a fifth call. During this conversation, Brown stated, "I was there. I saw everything with my own two eyes. I thought I was about to get shot." Brown further stated to the caller after "it was over," she attempted to collect jackets from the ground and must have picked up S-Dot's jacket because he pointed a gun at her and said, "Put my coat down you b[***]." She threw his coat on the ground.

¶ 19      Detective Fanelli entered the room. Brown told Detective Fanelli what she heard regarding the earlier altercation involving Winlow. According to Winlow's girlfriend, Winlow and Kaythiese were challenged to a fight by people named Raymond and Kenny. Brown was told Kenny knocked on Winlow's door looking to fight, but Winlow told Kenny he did not want to fight. Winlow eventually fought Raymond, while Kaythiese and Kenny fought.

¶ 20      A short time later, Winlow arrived at Brown's apartment with a knot on his head.

Brown believed the dispute was over. She left with Winlow and Kaythiese to walk to the bus stop to run some errands. A group of men, including defendant, Davis, Kenny, Anthony, S-Dot, Antoine, and Deandre , walked around the corner and confronted Winlow and Kaythiese. Defendant and Winlow squared up to fight, while Kaythiese and Antoine began to fight. Defendant pulled out a gun and shot Winlow in the back. Others pulled out their guns and waved them around. Defendant ran off while Deandre fired his gun four times, striking Jackson.

¶ 21        Detective Fanelli left the room around the 28-minute mark. Brown took another call. During this call, Brown again described the shooting and identified defendant as the shooter. Brown told the caller it happened in front of her. Brown also told the caller, "Yes, I am. You can call me what you want to. I am a snitch about mine, you most definitely right." Brown stated four of the men had guns, but only defendant and Deandre fired their guns.

¶ 22        Detective Fanelli reentered the room with photos. Brown identified defendant in a photo and stated defendant shot her son. Brown reported defendant used to have "dreads" but, on the date of the shooting, his hair was short. Kenny did not have a gun.

¶ 23        Winlow testified under subpoena. He and defendant grew up together. They were not friends, but Winlow did not dislike him. When asked if they were just acquaintances, Winlow responded, "We just cool. We just cool. We play ball together." Winlow testified he and defendant had been in a fist fight before. They "were just playing." On previous occasions, Winlow fought with Robert Jackson, Kaythiese, and Da'vid Parks. (We note Parks appears in the record as Da'vid Parks, Daveed Parks, and David Parks.) They probably fought "over a girl." But then they "suck it up because we friends." The day of the shooting, Winlow wrestled with defendant.

¶ 24        When the shooting occurred, Winlow saw approximately 20 people coming out of

the field dressed in all black and wearing ski masks. They all had guns. Winlow was asked what he was doing. Winlow ran and then was shot. Because of the masks, defendant could not identify the shooter.

¶ 25　　　　Kaytrel Fitch testified he was present at the shooting. Kaytrel resided at 1213 Orchard Road. Kaythiese is Kaytrel's brother. On November 5, 2012, Kaytrel was home sleeping. Kaythiese woke Kaytrel to tell him he had been jumped. Kaytrel went outside with Kaythiese. "[A] bunch of guys came around the corner" and walked "[t]o the field across the street from [his] house." Kaythiese went across the field two to three minutes later. Kaythiese began fighting with someone. Kaytrel ran over to help his brother when he heard a gunshot. Kaytrel grabbed Kaythiese and they ran. Kaytrel saw Winlow and defendant at the scene. Both were "just standing." Kaytrel did not see a gun or the shooter. Earlier that day, he had seen Kaythiese fight with someone who had dreadlocks.

¶ 26　　　　Tamika Alexander, Kaytrel and Kaythiese's mother, testified she saw a group of boys fighting across the street from her apartment. She went outside to see where her sons had gone. As she approached the commotion, Winlow ran past and told her to call 911. Winlow said, "I'm hit." Alexander told him he was lying. She then hid behind a fence and called 911. While on the phone with 911, Alexander heard gunshots. She had not heard shots earlier. Though she originally agreed to talk with police at the station, Alexander decided against it after talking with Kaythiese. She did not want to subject herself or her children to more violence.

¶ 27　　　　Brentais Hawkins testified defendant admitted shooting Winlow. Hawkins testified he was incarcerated in December 2012 for burglary. At the time of his testimony at defendant's trial, Hawkins was incarcerated for failure to report to pretrial services. From 2006 to 2007, Hawkins lived with defendant's mother, Ervina. At that time, two of Ervina's children

- 8 -

lived there as well. Hawkins saw defendant occasionally when he visited, about once or twice per week. Hawkins did not consider himself a fatherly figure to Ervina's children.

¶ 28        According to Hawkins, around December 13 or 14, 2012, defendant and Hawkins were in the west pod of the county jail together for approximately one week. Hawkins agreed he and defendant "would socialize and talk and hang out together." They talked "[p]robably once or twice, about 20 or 30 minutes" in total. Defendant told Hawkins he and some members of M.O.B. were in a fight with B.O.M. Hawkins thought "it had something to do with a rap battle." The fight occurred on Orchard Road. Defendant told Hawkins: "[T]hey [were] fighting, and one of the opposing [M.O.B.] members was getting the best of someone. He shot at him." When asked if defendant told Hawkins the type of gun he used to shoot Winlow, Hawkins said, "I believe it was a 380 handgun." Defendant said, "they jumped in the van and they drove off."

¶ 29        Hawkins admitted he had a domestic-battery conviction and the victim in that case was defendant's mother. He admitted he had multiple felony convictions, including obstructing justice by providing false information, possession of a stolen motor vehicle, aggravated reckless driving, theft, and aggravated battery. Hawkins testified he had not been promised anything for his testimony, but he was hoping his cooperation would help him get a lighter sentence.

¶ 30        Richard R. Barkes, a detective with the Bloomington Police Department, testified defendant was arrested on November 6, 2012, for failure to appear in court on another matter. Detective Barkes testified the interview was video recorded. The interview was played for the jury. During the interview, defendant changed his story multiple times. He admitted to lying when he changed his story. Defendant first denied being at the scene and having any knowledge of the shooting. Later, he admitted being at the scene and fighting Parks. Defendant said Parks

shot at defendant but hit Winlow. Defendant also initially stated he wore a blue sweatshirt on the day of the shooting. Defendant later said he wore a red Hollister hooded sweatshirt.

¶ 31 Video surveillance footage, introduced by the State, shows defendant leaving the Bloomington Law and Justice Center around 2 p.m. on the date of the shooting. In that video defendant was wearing a red Hollister sweatshirt and his hair was cut short.

¶ 32 Police recovered a red Hollister sweatshirt from defendant's residence on November 6, 2012. The cuffs of the red Hollister sweatshirt, tested in January 2013, were negative for gunshot residue. The expert who conducted the testing explained gunshot residue may not appear on a sweatshirt if the sleeves were pushed up during the shooting or the residue fell off after having been shaken or worn since the shooting.

¶ 33 The defense rested without presenting any evidence.

¶ 34 The jury found defendant not guilty of attempt (first degree murder) but guilty of all other counts. Defendant was sentenced to 18 years' imprisonment for aggravated battery and a concurrent 3-year term for the aggravated-unlawful-use-of-a-firearm convictions.

¶ 35 B. Direct Appeal

¶ 36 In his direct appeal, defendant asked this court to find plain error occurred when the trial court admitted two consistent statements Brown made identifying defendant as the shooter of Winlow. We found the issue waived, as trial counsel expressly agreed the jury could consider the interview and the grand-jury testimony. *People v. Williams*, 2015 IL App (4th) 130637-U, ¶¶ 30, 36.

¶ 37 Also in his appeal, defendant argued his conviction for aggravated unlawful use of a weapon violated the one-act, one-crime rule. *Id.* ¶ 2. In considering this issue, we observed the Illinois Supreme Court held unconstitutional on its face the section of the statute for which

- 10 -

defendant was convicted of one count of aggravated unlawful use of a weapon. *Id.* ¶ 41 (citing *People v. Aguilar*, 2013 IL 112116, ¶ 22, 2 N.E.3d 321). We reversed the conviction on that charge but upheld the other two aggravated-unlawful-use-of-a-weapon convictions. *Id.* ¶ 2.

¶ 38                                    C. Initial Postconviction Petition

¶ 39          In his *pro se* postconviction petition, defendant argued, in part, trial counsel provided ineffective assistance when counsel failed to object "to improper hearsay recordings of [an] inconsistent witness." *People v. Williams*, 2018 IL App (4th) 160154-U, ¶ 2. The trial court summarily dismissed the petition, finding the statements admissible. *Id.* We affirmed the dismissal upon concluding defendant pursued on appeal an argument that did not appear on the face of his postconviction petition. *Id.* ¶¶ 3, 38, 42.

¶ 40              D. Leave to File a Successive Postconviction Petition

¶ 41          On August 22, 2019, defendant filed a *pro se* motion for leave to file a successive postconviction petition. Defendant's filings raised two claims: (1) actual innocence based on newly discovered evidence and (2) ineffective assistance of appellate counsel on direct appeal.

¶ 42          To support his claim of actual innocence, defendant attached three documents, including a May 16, 2018, affidavit from Jamell Jamison. The affidavit consists of one paragraph with no punctuation and multiple grammatical, capitalization, and spelling errors. It states the following, with no corrections or additions made by this court:

> "In Early November of 2012 I witnessed a shooting
> involving the mob and bom of the Bloomington area although Iam
> not affiliated with either group I know of both groups threw there
> music On the day of the shooting I was told by DAVID parks that
> they were meeting up with the mob to squash their beef I was

meeting up with them because I am not enemies of either group and hoped my presence could lessen the conflict *As I was on orchard I seen the two groups* approach each other with what seemed like a talk I was not with either group but was on the side walk as the groups met up out of the groups *I seen people that I recognized from music videos and Iam certain that pimp was not out there Iam positive he wasn't the shooter either* as I stood on orchard with daveed who ran towards the fight I seen some one *who had dread locks pull out a gun and shoot he shot multiple times* and everybody accept him ran I dropped my cell phone and was scared to let the police know that I was a witness so I never asked for me property back I never spoke to the police about this because my friend daveed asked me not to help the mob he is resting in peace now so I feel it's only right to help some one I know who is innocent and in jail for something he did not do."
(Emphases in original.)

¶ 43        In his petition, defendant argued Jamison's affidavit supports his claim as it contradicts Brown's statements naming two shooters. In addition, Jamison described the shooter as having dreadlocks, while the trial evidence shows defendant had short hair at the time of the shooting.

¶ 44        Defendant also attached a McLean County incident report completed by Detective Jared Roth on December 13, 2012. According to the report, Detective Atteberry obtained a search warrant "in regards to information he received about a gun believed to be connected with

- 12 -

the shooting on Orchard Street in November 2012." The Bloomington Police Department SWAT team executed a search warrant on "a subject by the name of Style Gray." While Gray was "being taken to the ground," a .45-caliber Colt Double Eagle handgun fell from Gray. During an interview, Gray stated he purchased the gun for protection due to the shootings that occurred during the summer of 2012. He purchased the gun from Ladika Tolise for $500.

¶ 45    Defendant argued the police, when looking for the gun used in the Orchard Road shooting, found the gun on Gray in December 2012. This same gun was used in an August 2012 shooting by Marshall Smith, for which Smith was convicted of aggravated battery with a firearm and aggravated discharge of a firearm. See *People v. Smith*, 2016 IL App (4th) 140520-U, ¶ 15. Defendant contends Smith, who matched the description of the shooter as described by Jamison and Brandi Guzouski, shot Winlow.

¶ 46    Defendant also attached an incident report from the Orchard Road shooting prepared by William Buchanan, an officer with the Bloomington Police Department. According to the report, Officer Buchanan made contact with an unnamed woman. Defendant contends this woman is Brandi Guzouski. According to this report, the woman stated she was sitting on her couch with her child when she heard five gunshots. She looked out her balcony window that overlooked the vacant lot and Orchard Road. The woman observed a black male, wearing a plain white T-shirt and dark pants "with dreadlocked hair approximately jaw-line length," walking northbound on the sidewalk. This male was moving rapidly but stopped at times to crouch down. This male pointed the gun at others at times and fired the gun.

¶ 47    In his proposed successive petition, defendant asserted Guzouski's account matches the physical evidence. Guzouski stated one shooter was moving rapidly, and the trial evidence shows only one set of cartridge cases was found. Defendant asserts there was no

reasonable explanation as to why counsel would not subpoena and secure testimony from an eyewitness who had no credibility concerns.

¶ 48　　　　As to his claim of ineffective assistance of appellate counsel, defendant asserts appellate counsel was ineffective for not alleging ineffectiveness of trial counsel based on trial counsel's failure to (1) subpoena Guzouski to testify and (2) object to the admission of Brown's statements to the police and grand-jury testimony. Defendant argued these shortcomings, as well as his mental illness, prevented him from raising these claims earlier.

¶ 49　　　　In December 2019, the trial court denied defendant's motion for leave to file a successive postconviction petition. The court found the evidence offered by defendant was available to defendant at the time of trial. The court found Smith's conviction was not evidence showing petitioner's actual innocence. That Smith may have been convicted of using a gun involved in the Orchard Road shooting does not show actual innocence but simply adds to the evidence the jury heard at trial. The court emphasized defendant acknowledged as much in his petition.

¶ 50　　　　As to the Jamison affidavit, the trial court concluded it was "not new" and did not establish actual innocence. The court emphasized Jamison was at the shooting and no explanation was provided as to why Jamison was not available to testify at defendant's trial. The court further found Jamison's testimony was simply cumulative to evidence the jury already heard. The court further found the ineffective-assistance-of-counsel claims were barred as they were raised or could have been raised in the previous proceedings.

¶ 51　　　　Defendant appealed, arguing he established a colorable claim of actual innocence, as the affidavit showed he could not have been the shooter. Defendant emphasized Jamison, who was present at the shootings, referred to one shooter and described the shooter as having

dreadlocks. Defendant further emphasized the video footage showed he, at the time of the shooting, did not have dreadlocks.

¶ 52        This court reversed and remanded for further proceedings. *People v. Williams*, 2021 IL App (4th) 200094-U, ¶ 4. We found Jamison's affidavit, taken as true, was (1) newly discovered (*id.* ¶ 65); (2) material rather than cumulative, as the jury did not hear testimony there was one shooter who did not match defendant's appearance on the day of the shooting; (*id.* ¶ 68); and (3) of conclusive character, as the affidavit plainly refers to one shooter, ruling out defendant (*id.* ¶ 73).

¶ 53                        E. Proceedings on Remand

¶ 54        On remand, an amended petition was filed. In the amended petition, defendant reasserted his actual-innocence claim. Defendant did not pursue his ineffectiveness-of-counsel claims.

¶ 55        The State filed an answer, agreeing the petition should be advanced for a third-stage evidentiary hearing. The State asserted defendant would not prevail at the evidentiary hearing as Jamison was not a credible witness.

¶ 56                        1. *Evidentiary Hearing*

¶ 57        The third-stage evidentiary hearing was held in December 2022. Defendant began by asking the trial court to take judicial notice of Jamison's testimony from the March 2022 third-stage postconviction hearing for Deandre, McLean County case No. 12-CF-1193. The State did not object. The State asked the court to take judicial notice of Jamison's May 16, 2018, affidavit. The court agreed to take judicial notice of both. The State further requested the court to take judicial notice of four cases: McLean County case Nos. 08-CM-460, attempt (obstructing justice); 09-CF-1145, obstructing justice; 17-CM-925, obstructing identification; and 19-CF-

- 15 -

1054, attempt (forgery).

¶ 58        Jamison did not testify at the hearing. According to the testimony from the March 2022 hearing regarding Deandre's conviction for shooting Jackson, Jamison was 25 years old at the time of that hearing. He vaguely remembered the afternoon of the shooting. He remembered "being outside going to see a friend." He saw "a couple people" on Orchard Road. He identified Deandre at that hearing but said he could not "really say that I know him." Jamison had seen Deandre, he thought, "from like YouTube videos, things like that." He did not remember seeing him in the neighborhood. Jamison did not know if Deandre had a nickname. Jamison observed the altercation on Orchard Road. He described the shooting as follows:

> "I want to say it was an argument. Again, a group of people. It got a little, you know, rowdy. I want to say maybe it was a fight, scuffle, something like that. And that was about it from where I was at the moment. And, you know, I started walking back towards my family members' house. And then I did hear a shooting. And that led me to run to my family members' house."

¶ 59        Jamison testified he saw a person with a weapon during the altercation. Jamison described that person as "African American, 6' 4," with long hair "to the middle of their back." Deandre was not the person he saw holding a firearm, as the photos in the newspaper show Deandre did not have long hair. Jamison did not notify the police or Deandre or anyone in his family. When asked the reason for not doing so, Jamison testified he thought he "just wanted to kind of stay out of it." Jamison explained he feared "being in a situation like this, I just wanted to keep it to myself at the moment; and, you know, maybe it would take care of itself." The situation Jamison wanted to avoid was court. He came forward after realizing Deandre had been

- 16 -

convicted. Jamison "felt bad [for] sending someone to jail for something that they did not do."

¶ 60 Jamison recalled signing the affidavit. He then agreed he saw "a large group of people" in an altercation. He testified more than 10 were present.

¶ 61 Jamison testified he dropped his cell phone as he ran. He did get his cell phone back. He stated:

> "I contacted the police station more than once. And it was like, you
> know, they didn't know what I was talking about. I went to—there
> is a—on the side of this building there is a place for like lost items
> and things like that, and he told me to check there. And that was
> pretty much it."

¶ 62 On cross-examination, Jamison testified he knew of the groups M.O.B. and B.O.M., but he did not know what the acronyms stood for. He was familiar with their music. He could not say he knew members of M.O.B. He had played sports with a few of them but knew the name of only one member. He knew someone from B.O.M., "DA'V," through mutual friends. When asked if that was the same person as "Dave Parks," Jamison testified he did not know. He was "not familiar with that name."

¶ 63 According to Jamison, when he went outside, he did not know either B.O.M. or M.O.B. would be outside. Jamison vaguely knew Deandre through YouTube videos. Jamison agreed he was convicted in 2007 in Du Page County for receiving illegal goods. He did not recall being convicted in the McLean County cases, including case No. 19-CF-1054, attempt (forgery), for which he was placed on conditional discharge. He believed "[a] few of those" were dismissed.

¶ 64 2. *Order Denying Defendant's Petition*

- 17 -

¶ 65        On January 12, 2023, the trial court entered a written order denying defendant's petition. The court summarized the evidence. Regarding the testimony from the evidentiary hearing, the court stated Jamison testified "he did not know [defendant] except by seeing him in YouTube videos and he stated that [defendant] was not present at the shooting which is contrary to other witnesses." The court further summarized Jamison's affidavit as averring "[defendant] was not present at the shooting and he is sure [defendant] was not the shooter," and yet defendant admitted to a police detective he was at the shooting. The court further highlighted Jamison was impeached with convictions, which he stated he did not remember. The court concluded Jamison was not a credible witness. In addition to the above facts found by the court, the court further noted the five-and-a-half-year delay between the shooting and Jamison coming forward with his testimony. The court determined, in light of the testimony of "Brittney Guzovskis" she heard five shots before looking out the window and Brown's initial and repeated version of the events, defendant had not met his burden of presenting new evidence "of such a conclusive character as to justify Post-Conviction Relief."

¶ 66        This appeal follows.

¶ 67                                II. ANALYSIS

¶ 68        Defendant appeals, arguing the trial court erred by denying his petition. Defendant contends the court incorrectly found Jamison's testimony was not credible. Defendant maintains Jamison's explanations for the delay in coming forward were consistent, the court relied on a misinterpretation of Jamison's testimony, and the convictions do not undermine his testimony but support the conclusion he did not come forward sooner for fear of the legal system.

¶ 69                                A. The Act

¶ 70   This appeal challenges an order denying defendant's postconviction petition after a third-stage evidentiary hearing under the Act. The Act provides criminal defendants a statutory remedy to "assert claims for substantial violations of their constitutional rights at trial." *People v. Robinson*, 2020 IL 123849, ¶ 42, 181 N.E.3d 37. Claims of actual innocence, like the one made here, may be raised under the Act. *People v. Coleman*, 2013 IL 113307, ¶ 94, 996 N.E.2d 617.

¶ 71   At the third stage, the defendant carries the burden of "making a substantial showing of a constitutional violation." *People v. Pendleton*, 223 Ill. 2d 458, 473, 861 N.E.2d 999, 1008 (2006). The defendant may meet this burden by presenting evidence supporting his or her constitutional claims. *People v. Andrews*, 403 Ill. App. 3d 654, 658-59, 936 N.E.2d 648, 653 (2010). At this stage, unlike in the first and second stages of the Act, the allegations are not taken as true. *People v. Reed*, 2020 IL 124940, ¶ 51, 182 N.E.3d 64. Instead, "the trial court acts as a factfinder, making credibility determinations and weighing the evidence." *Id.* A decision denying postconviction relief after a third-stage evidentiary hearing is, therefore, reviewed for manifest error. *Id.* We will find manifest error "when the opposite conclusion is clearly evident." *Coleman*, 2013 IL 113307, ¶ 98.

¶ 72   While an actual-innocence claim may be pursued under the Act, the standard to obtain relief for such a claim "is extraordinarily difficult to meet." *Id.* ¶ 94. To succeed on an actual-innocence claim, "the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial." *Id.* ¶ 96. The conclusiveness element "is the most important element of an actual[-]innocence claim." *Robinson*, 2020 IL 123849, ¶ 47. To be "conclusive" means "the evidence, when considered along with the trial evidence, would probably lead to a different result." *Coleman*, 2013 IL 113307, ¶ 96. The question of conclusiveness requires trial courts to engage in credibility determinations "uniquely

appropriate for trial judges" while considering whether the "new, material, and noncumulative" evidence places the trial evidence "in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *Id.* ¶ 97. "The new evidence need not be entirely dispositive to be likely to alter the result on retrial." *Robinson*, 2020 IL 123849, ¶ 48. Probability, not certainty, is the key in deciding whether the new evidence is conclusive. *Id.*

¶ 73      The State does not dispute Jamison's testimony was new, material, and noncumulative, meaning the issue turns on the question of whether the trial court erred in finding defendant failed to make a substantial showing the evidence was not conclusive. Defendant's third-stage showing relies solely on Jamison's testimony.

¶ 74      Vital to defendant's postconviction claim is Jamison's credibility. Proving Jamison credible presented a high hurdle for defendant as Jamison, despite being subpoenaed to testify, did not testify at his third-stage hearing. This denied the trial court the opportunity to evaluate Jamison's demeanor, body language, and tone. See generally *People v. Carter*, 2021 IL App (4th) 180581, ¶ 70 (describing the importance of paralanguage when evaluating witnesses testifying from the witness stand). This also placed the trial court in the same position as this court, leaving the trial court with the task of "reviewing a cold record devoid of all of the crucial ways in which humans communicate in person, both verbally and nonverbally." *Id.*

¶ 75      Without Jamison's live testimony, the trial court could evaluate his testimony by comparing the two pieces of Jamison's testimony before it—the affidavit and the transcript of the testimony from Deandre's third-stage hearing. Our review of that testimony reveals many inconsistencies between the two. Initially, we note the court incorrectly concluded Jamison testified defendant was not present at the shooting and, thus, improperly relied on this fact as a basis for finding Jamison lacked credibility. That is not to say, however, the credibility finding is

manifest error, particularly in light of the inconsistencies of the testimony. For example, in the affidavit, Jamison averred he was told by "DAVID parks" they were meeting up with M.O.B. "to squash their beef" with B.O.M. on the day of the shooting and he referred to "daveed" as the reason he did not come forward sooner. Yet, Jamison testified at the hearing he was not familiar with the name "Dave Parks." He testified he only knew a "DA'V" through mutual friends. Jamison also testified he went outside on the day of the shooting to meet a friend and did not know M.O.B. and B.O.M. were outside. In his affidavit, Jamison averred he dropped his cell phone and "never asked for me property back," but, at Deandre's hearing, Jamison testified he called the police station "more than once" regarding his phone and did receive it. In his affidavit, Jamison averred he did not talk to the police sooner about what he witnessed "because [his] friend daveed asked [him] not to help the mob," but Parks was "resting in peace now," so he felt it was only right to help someone he knew to be innocent. At the hearing, however, when asked why he did not come forward sooner, Jamison did not mention "daveed." Instead, Jamison testified he delayed because he wanted to avoid court and he came forward only after realizing Deandre had been convicted. Moreover, in his affidavit, Jamison described the shooter as having "dread locks." When he testified, however, Jamison did not mention "dread locks" but testified the shooter had long hair "to the middle of their back."

¶ 76    The inconsistencies between the affidavit and Jamison's testimony were not the only facts undermining Jamison's credibility. Jamison's testimony exculpating Deandre came five-and-a-half years after the shooting—following Deandre's failed appeal. Jamison did not testify at defendant's evidentiary hearing, creating doubt Jamison's conscience over an imprisoned innocent is what spurred his testimony. Moreover, Jamison had a history of multiple crimes of dishonesty.

- 21 -

¶ 77        Jamison's refusal to testify, the inconsistencies in his testimonies, the delay in

Jamison's coming forward, and Jamison's multiple crimes of dishonesty prevent defendant from

making a substantial showing of a constitutional violation. The trial court's denial of his petition

is not manifestly erroneous.

¶ 78                              B. Due Process

¶ 79        Defendant last argues, in the alternative, we should remand for a new evidentiary

hearing, as the trial court violated his right to due process when it denied his petition based on an

inaccurate recollection of the evidence. Defendant points to the court's repeated conclusion

Jamison testified *defendant* was not at the scene and used that conclusion to find defendant was

not credible.

¶ 80        A trial court's failure to recall and consider testimony critical to a defense results

in a denial of a defendant's due-process rights. See *People v. Mitchell*, 152 Ill. 2d 274, 323, 604

N.E.2d 877, 901 (1992). Here, Jamison's credibility was the key issue at defendant's evidentiary

hearing. The court did not properly recall the testimony before it. At no point did Jamison testify

defendant was not at the scene of the shooting. Jamison's testimony did not mention defendant.

His testimony was used only to show defendant could not have shot Winlow.

¶ 81        The determination a defendant's due-process rights have been violated does not

end the analysis and necessitate a new hearing. Reversal is not required if the due-process

violation is harmless beyond a reasonable doubt. See generally *People v. Junior*, 349 Ill. App. 3d

286, 292, 811 N.E.2d 1267, 1272 (2004) (considering whether a due-process violation was

harmless); *Mitchell*, 152 Ill. 2d at 326 (finding the evidence of the defendant's guilt at trial so

overwhelming it made the denial of defendant's due-process rights harmless error); see also

*People v. Thurow*, 203 Ill. 2d 352, 364, 786 N.E.2d 1019, 1026, 192 (2003) (observing "most

constitutional errors can be harmless").

¶ 82  We find the trial court's incorrect recollection of the evidence harmless beyond a reasonable doubt. As shown above, Jamison's credibility was undermined by multiple inconsistences in his short testimony, the delay in bringing the issue to the attention of authorities, and Jamison's history of crimes of dishonesty. We are convinced beyond a reasonable doubt defendant could not have met the standard of making a substantial showing of a constitutional violation even if the court properly recalled the evidence.

¶ 83        III. CONCLUSION

¶ 84  We affirm the trial court's judgment.

¶ 85  Affirmed.